MARY HARTUNG, plaintiff in error, *v.* THE PEOPLE, defendants in error.(*a*)

H., having been convicted of murder, and been sentenced in March, 1859, to be executed, this court-reversed the judgment, because the legislature had subsequently (in 1860) enacted a statute which forbade the execution of sentences of that character, and had required that such convicts should be imprisoned for one year, and then executed, if the governor should issue his warrant for that purpose; the court considering the provision for imprisonment and death in the same case, to be an *ex post facto* law, and holding it to be void.   *Held,* that H. could not be again tried and convicted for the same murder.   That the reversal of the judgment against her, proceeding as it did upon the absence of any law for the punishment of her offense, had effectually exempted her from being again tried and sentenced for the murder charged in the indictment, as it shielded her from the execution of the sentence already pronounced; and was equivalent to an acquittal upon that charge.

*Held, also,* that the effect of the act of 1860, "in relation to capital punishment," &c., was to forbid, from the time of its passage, the infliction of the penalty of death, simply, and unconnected with any other punishment, in any case, and to substitute for such penalty the year's imprisonment, and then the putting to death of the offender, in some form, if the governor shall so determine.   That the substitute might have the full effect intended

as to future offenses, but could have no operation in respect to those already committed.

*Held, further*, that the Act of April 17, 1861, (chap. 303,) "in relation to cases of murder," &c., repealing the Act of 1860, and restoring the previous statutes, did not affect the case of H.; the judgment reversing and annulling her conviction having been previously pronounced, and being *res adjudicata* between the people and her.

It was also *held*, that the award of a *new trial* by this court, on reversing the previous judgment, was improvidently entered, the prisoner being entitled to her discharge, as the facts involved were contained in the record.

ERROR to the Supreme Court. The decision sought to be reviewed and reversed is reported in 23 Howard's Prac. Rep. 314. The facts are there fully stated. The judgment was that the judgment of the court of oyer and terminer should be reversed, and the demurrers to the replications overruled, with leave to the defendant to rejoin, or to withdraw the special pleas in bar, and to proceed to trial upon the plea of not guilty, to the indictment, &c.

*Wm. J. Hadley*, for the plaintiff in error.

*Ira Shafer*, district attorney, for the defendants in error.

DENIO, Ch. J. When the case of the plaintiff in error came before us on a former occasion, she had been convicted of murder upon a legal trial, and had been sentenced to be executed. This court then reversed the judgment, because the legislature had subsequently enacted a statute which forbade the execution of such sentences as that which had been pronounced against her, and had required that such convicts should be subjected to imprisonment at hard labor for one year, and, as we construed the legislative intention, should thereafter be executed if the governor should issue his warrant for such execution. We considered this provision for imprisonment and death in the same case to be an *ex post facto* law, and held it to be void, because the constitution of the

United States had prohibited the states from enacting such laws. It was considered to be *ex post facto*, because it attempted to change the punishment which the law had attached to the offense of the prisoner when it was committed, not by remitting some desirable portion of it, but by altering its kind and character. The principle of the judgment then rendered has been since reaffirmed and applied in the case of *Shepherd* v. *The People*, decided in December last, but not yet reported.(*a*).

Laying out of view for the moment the act relating to murder, passed in the year 1861, and considering this case as uninfluenced by that act, the inquiry is, whether this convict can be again tried and convicted for the same murder? The legislature, by declaring that persons under sentence of death when the act of 1860 was passed, instead of being executed according to their sentences and according to the law as it had existed up to that time, should be put to hard labor for a considerable period, and afterwards held their lives at the pleasure of the executive, and be executed when in his discretion he should think proper so to order, did respectively repeal, as to that class of offenders, the prior law for the punishment of murder. As the punishment attempted to be substituted for that provided by the antecedent law which had been abolished, could not be applied on account of the constitutional prohibition, it followed inevitably that the interference of the legislature had rendered it impossible that the prisoner should be punished under either law. It was not a sufficient answer to the difficulty to say that the members of the legislature did not probably intend to grant impunity to offenders in the situation of the prisoner. They did intend to abrogate as to her, and as to all persons in the same situation, the former punishment, and that design they effectually carried out. They intended also that such offenders should be punished in another way, but this they could not effect on account of the constitutional inhibitions.

(*a*) Since reported, 25 N. Y. Rep. 406.

The reversal of the judgment against this prisoner, proceeding, as it did upon the absence of any law for the punishment of her offense, has effectually exempted her from being again tried and sentenced for the murder charged in the indictment, as it shielded her from the execution of the sentence already pronounced.   If a new verdict of guilty should be returned on a second trial, it would be impossible to render a judgment of death pursuant to the revised statutes, because the legislature had forbidden her to be punished in that way.   It would be as true after such fresh trial and verdict, that she was a person who had been under sentence of death, when the act of 1860 was passed, as it was when we reversed the judgment; and the same reason which compelled us to reverse that judgment would preclude the giving a similar judgment upon the second verdict, and would require the reversal of such second judgment, if one should be rendered.   It would be equally impossible to pronounce the compound judgment of imprisonment at hard labor, and a subsequent execution, as mentioned in the act of 1860, because the constitutional objection to that law would apply to the case after a second trial, and a new conviction, in the same manner as it did to the judgment rendered upon the first conviction.   It is therefore apparent to my mind, that in reversing the judgment which had been rendered against the prisoner, we necessarily determined that the legislature had so interfered with the arrangements for the punishment of the crime of murder, that a particular class of offenders, embracing the prisoner, could not be punished at all.   It was the duty of the court of oyer and terminer to give effect to that judgment, in its disposition of the prisoner's case, upon the record being remitted to that court.   The order which it made was in accordance with the law as it was here adjudged, and unless the act of 1861 affects the case, we think it was the only order which it could lawfully make.

There is a view of this case which requires some further explanation.   If it were true that the only part of the act of

404     Hartung *v.* The People.    [Ct. of Ap.

Opinion of Denio, Ch. J.

1860 which was designed to reach the case of offenses com‑mitted before that act was passed was the 10th section, which declares that persons then under sentence of death or await‑ing sentence upon a conviction for murder should be punished in a particular way, and if all other provisions of the act were prospective only, then inasmuch as the substituted pun‑ishment could not be inflicted, on account of the *ex post facto* character of the provision contained in that section, it might be argued that the section was void, and that it being the only provision abolishing the punishment provided by pre-existing laws, the prisoner ought to have been left to suffer according to her sentence, which was pronounced under and in accordance with these laws. It is therefore a material inquiry whether, by the true construction of the act, the former punishment was abolished generally, and the new one substituted in respect to all offenses of murder already com‑mitted? The act commences, in the first section, by declar‑ing that no crime thereafter committed, except treason or murder in the first degree, shall be punished with death. The following sections, to the 6th inclusive, are devoted to the new definition of murder in the first and in the second degrees, and to the mode of punishing these offenses, namely, by one year's imprisonment at hard labor, and then by a capital execution if and when the governor shall issue his warrant as to the first, and by perpetual imprisonment at hard labor as to the second degree. If the act had stopped here, it ought, I think, to have been considered as wholly prospective, and it would have left the pre-existing laws to apply to offenses committed prior to the act. But the seventh section, which immediately follows, is an alteration of the section of the revised statutes which denounced the penalty of death for treason, murder and the first degree of arson. It declares that it shall be amended so as to read as follows: "Every person who shall hereafter be convicted of treason, murder, and arson in the first degree, as those crimes are respectively de‑fined in this title, shall be punished as herein provided."

The words "herein provided" must be construed to refer to the provision for punishment contained in the act, and not the one mentioned in the revised statutes, though if the section as thus amended kept its place in the title of the revised statutes, to which it belongs, according to the system of amendments made in that form, the reference would be to those statutes. But such a reading would leave all these offenses without any punishment whatever, and certainly could not have been intended. Where new provisions or modifications of existing provisions are enacted by declaring that a particular section shall be amended so as to read in a given manner, in the form made use of in this case, the new part is to be construed, as regards the subject upon which it is to take effect, in the same manner that an independent statute, having the same provisions, ought to be construed. (*Ely* v. *Holton*, 15 N. Y. Rep. 595.) In interpreting this section upon that principle, the new punishment mentioned in it is attached to all future convictions, without regard to the time when the offense was committed. It is possible that such a verbal construction might, if there were nothing of a contrary tendency in the act, be forced to yield to the principle that a retrospective effect is not generally to be given to an act of the legislature when it can be avoided. But this could only be accomplished by rejecting the natural meaning of the language. Passing over these seventh and eighth sections as not material to the present question, we come to the tenth, which, as already mentioned, declares that all persons then (that is, at the time of the taking effect of the statute) under sentence of death, or convicted of murder and awaiting sentence, shall be punished as if convicted of murder in the first degree under the act; that is, by both imprisonment and death. This renders it perfectly certain, as it seems to me, that the change of punishment was intended to apply to offenses already committed. Persons who had been convicted before the act was passed must, of course, have committed the offenses of which they were

convicted prior to that time.   There might be a good reason
for suffering offenders, who had been condemned in the course
of criminal proceedings, to receive the punishment which the
law had annexed to their offenses, though it might at the
same time be judged proper to change the punishment of
those who had not yet been presented; but there can be no
conceivable motive for inverting the position, by suffering
the old law to remain as to offenders who were yet to be tried,
while such as had received judgment under the former law
should have their sentences changed by legislative enactment.
The reason for a change of punishment in regard to actual
convicts would apply with greater force to offenders who had
not yet been prosecuted.   The intention of the legislature
seems to me very plain.   The amendment of section one
of the fourth part of the revised statutes prescribed the new
punishment for all future convictions; and as it was not in-
tended that the old punishment should ever be resorted to,
the case of persons who had been actually sentenced or tried
and convicted, and who were awaiting sentence, was taken
up, and their punishment changed by the usual expedient
of a legislative revision, so as to conform them to the altered
rule, which had been established respecting future convictions,
and for all other cases.   The last section of the act furnishes
additional evidence to the same effect.   It repeals, by their
numbers, twelve sections of the revised statutes.   The repeal
is absolute, direct and immediate.   Those sections, it is said,
"*are* hereby repealed."   On looking at those repealed sec-
tions it will be seen that they contained provisions inconsist-
ent with the new mode of punishment, though well suited
to the former method.   Section twelve required the execution
to take place at a time not more remote than eight weeks
from the time of the sentence, which of course would not
admit of the year's intermediate imprisonment.   Section
thirteen required the judge who presided at the trial, imme-
diately to send to the governor a statement of the conviction
and sentence, with his notes and the testimony.   There was

no other apparent motive for this repeal, except that it was re-enacted in the same language in the new statute. The repeal of the fourteenth section, which empowered the governor to require the opinion of certain judicial officers upon the statement, proceeded upon some motive not apparent to me. The sixteenth, seventeenth, eighteenth and nineteenth sections of the revised statutes provided for the case of convicts alleged to have become insane, after being sentenced to death. A summary inquiry to determine the fact of insanity was to be instituted before a jury, and if the convict was thereby found to be insane, the execution was to be suspended until the sheriff should receive a warrant from the governor, or from the justices of the supreme court, directing the execution. The inquiry as to the existence of insanity would be pertinent under either system of punishment; but to the arrangement which required a preliminary imprisonment of one year, and then the governor's determination that execution should take place, the provision which gave the judges authority to issue the warrant would be hostile. The sixteenth and seventeenth sections were therefore allowed to stand, and the eighteenth was amended by the eight section of the act of 1861, by repealing the part allowing the judges to issue the warrants. The section was changed in another particular, not material to the present question. By the nineteenth section the governor was authorized, as soon as he should be convinced of the sanity of the convict, to appoint a time and place for his execution. As this might interfere with the year's preliminary imprisonment, at hard labor, the section was embraced among those which were repealed. Three of the repealed sections, the twentieth to the twenty-second inclusive, make certain provisions for the case of a female sentenced to death, and discovered to be pregnant. An inquiry into the fact is directed, and the execution is to be suspended until the impediment shall have ceased to operate, when the governor is authorized to fix a day for it to take place. This would be

unnecessary and inapplicable where a year's imprisonment is required to intervene between the sentence and the capital infliction, though coherent and judicious as applied to the former law.  A similar motive existed for repealing sections twenty-three and twenty-four, because, under their provisions, a capital execution might take place within one year from the time of the sentence.  They required the Supreme Court to appoint a time for the execution of a capital sentence, when the time fixed by the sentence itself, had, for any reason, passed by, and to issue their warrant to the sheriff for that purpose.  This would take from the governor the discretion which the new mode was intended to vest in him, and might require the execution to take place within the year.

The reason for the repeal of section twenty-five, which declared that the punishment of death should be by hanging, it is more difficult to understand.  As it seems clear that it was designed by the authors of the statute that capital punishment should in some cases be inflicted, I am inclined to suppose that the repeal of this provision was inadvertent. It is not, however, necessary to solve that doubt.  The actual and immediate repeal of the sections is certain, and the consequence is the same, whatever may have been the motive which led to it.

One of the sections of the revised statutes, stated to have been repealed by the last section of the act of 1860, is section twenty-nine.  There is no such section in that title, the section numbers ending at section twenty-seven; but the substance of an act of 1846 (ch. 118) is incorporated into some of the late editions of the revised statutes, and is there numbered twenty nine, and it is this provision which is attempted to be repealed.  (See R. S., 5th ed., vol. 3, p. 938.)  It provides for the case of a prisoner under sentence of death, being confined in a jail in another county from that in which he was convicted, in consequence of the proper jail being unsafe, &c.; and the direction is, that the sheriff of the county in which he is actually confined shall, "on the day appointed

for the execution of the sentence," perform that duty. It was seen that this enactment, if literally followed, would compel an execution without allowing a space for the year's imprisonment, and hence it was repealed.

I have been thus particular to state the effect of this repealing section, which took effect immediately upon the passage of the act of which this is a part, in order to show the persistent determination of the legislature that no capital execution under the former laws should thereafter take place, and to establish that there is no ground for saying that the change of punishment was intended to be prospective merely, or that there was an implied saving in the statute in respect to offenses theretofore committed. The plain direction, by which the new rule is applied to all future convictions; the express provision made to embrace the cases of offenders already convicted and sentenced, and the present repeal and amendment of all those portions of the revised statutes which would conflict with the immediate operation of the new mode of punishment, demonstrate, I think, the design of the legislature to apply that mode to all future execution of sentences of death, whenever the offense was committed, and whenever the conviction took place. I have not overlooked the rule of interpretation, by which general language in a statute is required to be construed prospectively and not retrospectively, unless a contrary intention plainly appears. A somewhat strained construction is allowed in such cases, when necessary to prevent injustice or public inconvenience, and in furtherance of a presumed general intention of the legislature. But the section of this statute, by which offenders, who had been actually tried, convicted and sentenced when it was passed, are expressly subjected to the new punishment, forbids any such forced construction in the present case: We know with absolute certainty that it was designed by the authors of the law to apply the new punishment to the case of offenders who had been already convicted under the antecedent law, and we can not therefore refuse to give

effect to the language by which they, in terms, subject all
future convicts to such new penalty, upon any suggestion
that they did not intend what their language naturally im-
ports.   The effect of the provisions of this statute therefore
is, to forbid, from the time of its passage, the infliction of
the penalty of death, simply and unconnected with any other
punishment, in any case, and to substitute for such penalty
the year's imprisonment, and then the putting to death of
the offender in some form, if the governor shall so determine.
The substitute may have the full effect intended as to future
offenses, but can have no operation in respect to those already
committed, for the reason which has been mentioned.   But
the pre-existing law having been displaced by a repeal, to
make room for the substituted system, it can not be resorted
to for any purpose, though such substituted system, in one
aspect of it, can not be upheld.

Some portions of the opinion prepared by Mr. Justice
SUTHERLAND, in *Shepherd* v. *The People,* (*supra,*) may be
considered hostile to a portion of the reasons given for the
judgment in *Hartung* v. *The People,* as reported in the 22d
volume of the N. Y. Reports, and which I have now more
fully explained ; but so far as that opinion conflicts with
these reasons, it was unnecessary to the determination of the
case, and was not concurred in by a sufficient number of the
judges to pronounce a judgment.

We are of opinion that the act of 1861 does not affect the
case of the plaintiff in error.   If it could apply to persons
in the situation in which she was when the act of 1860 re-
pealed the penalty to which she was subject by the antece-
dent law, it must be by retracting the repealing clauses and
reinstating such antecedent law, and directing its application
to her case and to the cases of all other persons similarly situ-
ated.   But while the repeal remained unaffected by any sub-
sequent law, the process against the plaintiff in error came
before this court in the regular course of justice, and the
question was presented whether the conviction and judgment

which had been pronounced respecting her should be affirmed and executed, or should be reversed and annulled as unwarranted by the then existing law; and the judgment was that it should be reversed and annulled.

No question can now be made as to the legal propriety of that determination. It is *res adjudicata* between the people of the state and the plaintiff in error. Now, acts done and closed, pursuant to a law which is subsequently repealed, must endure and stand, and be good and effectual notwithstanding such repeal. (Dwarris on Statutes, 534.) This was the case as to the alleged offense of the plaintiff in error. When the process against her was presented for final adjudication in this court, and it was found that there was no law authorizing the punishment of her imputed offense, a judgment was pronounced in her favor, which absolved her from being again legally questioned for that offense. It was equivalent to an acquittal upon that charge, for it was the judgment of a court of competent jurisdiction, that in the then state of the law she could not be subjected to punishment. The effect of the repealing act of 1860 was to expunge the prior law from the statute book as completely as though it had never existed. If the legislature was competent to change this state of the law by a repeal of the repealing act, and to thus blot out such first repealing act, so that it could not thereafter be availed of, which it is not necessary to deny, still it could not, in my judgment, destroy the effect of a judgment pronounced in the meantime, and while the first repealing act was in force. Suppose a person had been prosecuted after the passage of the act of 1860, and before its repeal by the act of 1861, for an alleged murder committed before the passage of such first mentioned act, and had been acquitted, not for want of proof of the *corpus delicti*, but upon the ground on which we proceeded when this case was before us for the first time, namely, that the act of 1860 had repealed the provisions of the revised statutes for the punishment of murder, no one, I suppose, would maintain that

such a person could be again prosecuted for the same offense, after the enactment of the statute of 1861. Such prosecution, in my judgment, would be liable to be defeated by two conclusive objections : first, that. the act of 1861, as applied to such a case, would be an *ex post facto* law, and unconstitutional. By the repeal of the provisions of the revised statutes, and the trial and acquittal of the offender, while such repealing law was in force, the act of the prisoner, though not innocent in a moral sense, would be dispunishable. A legislative act restoring the repealed law would have precisely the same effect as though the offense had not been punishable originally, but had been made so for the first time by the restoring act. Such a law would be within the spirit of the constitutional prohibition, and would, in my opinion, be void. The other objection referred to, would arise under the constitutional injunction that no person shall be twice put in jeopardy for the same offense. These would be good pleas at the common law, and the constitution only affirms the principle, and renders it unalterable by any exertion of the law-making power. But it does not apply when the indictment was defective, so that no lawful judgment could be rendered upon it, or in the case of a mistrial, as where there was no verdict, or where the trial jury did not consist of the full number of twelve jurors, or where a new trial had been ordered on account of erroneous rulings on the first trial, or in cases of the like nature, nor where the jury was discharged upon necessity without rendering a verdict. In this class of cases it may be said that the accused was never in legal jeopardy. But when neither the indictment nor the trial was subject to any legal exception, but the conviction or judgment has failed of its natural effect by the interposition of the government or of the prosecution, it would be contrary to the spirit and intention of the rule, and of the constitutional provision in affirmance of it, if the accused could be subjected to another trial for the same offense; and, moreover, as it seems to me, it would be manifestly unjust and

oppressive.  If the legislature can authorize a second tria.
where there has been a conviction which has become ineffec-
tual by its own interposition, it may do so when there has
been an acquittal.   The two cases fall within the same reason.
I have not considered it necessary to refer to the numerous
cases where the rule and its exceptions have been the subject
of judicial exposition, because the most material of them
have been very carefully examined in the opinion in the be-
forementioned case of *Shepherd* v. *The People*.   That case
itself is a precedent for the judgment I am about to recommend
in the present instance.   The offense of Shepherd, which was
arson in the first degree, was committed prior to 1860, and
his trial, upon which he was convicted, took place in the
early part of 1861, and before the enactment of the act of
that year.   He was sentenced to perpetual imprisonment, in
intended obedience to that act.   The revised statutes, in force
when the act of which he was accused was perpetrated, did
not, as we held, warrant the mode of punishment, and the act
of 1860 was held to be void in its application to that case,
as being an *ex post facto* law.   We were, of course, bound
to reverse the judgment of the oyer and terminer, which had
been affirmed by the Supreme Court, and the question then
arose whether it was proper to award a new trial, or whether
the accused should be discharged.   This involved the con-
sideration of the effect of a trial and verdict perfectly legal
and regular upon an indictment in all respects sufficient, and
where the only error consisted in pronouncing a judgment
which was not warranted by any law.   It was determined
that the prisoner had been once placed in jeopardy in the
sense of the constitutional provision, and we added to the
reversal of the judgment an order that he should be discharged.
The question did not arise, whether he could have been
sentenced under the provisions of the revised statutes, as
no such sentence had been given.   The point adjudged was
the same which is now presented.   In neither case was there
any defect or error in the indictment, trial or verdict.   In the

case of Shepherd the judgment was illegal; in that of the present plaintiff in error, the judgment had become illegal by the repeal of the law by which it was once authorized; but we held in the case of Shepherd that the former conviction precluded the possibility of a second trial, and on that ground we made the order for the discharge of the prisoner. The principle thus settled shows that the judgment of the oyer and terminer in the present case was correct.

I have intentionally omitted, in what has thus far been said, to make any reference to the order which was entered for a new trial when the judgment against the plaintiff in error was reversed. If the effect of the judgment of reversal under the circumstances, and for the reasons upon which it proceeded, was such as to render another conviction impossible, the order so entered would not deprive her of the benefit of that judgment. It did not in terms direct a new trial upon the issue of not guilty of the murder of which she stood charged, and in connection with the reasons which were given for the judgment of reversal, it could not well have been so understood; for we, hold that whether guilty or not, the legislative interposition and the constitutional prohibition against changing the punishment which existing laws had attached to an offense already committed, prevented any sentence against her. Besides, her guilt of the act charged had been established by an unexceptionable trial and verdict. If she had been punishable under the revised statutes, notwithstanding the act of 1860, the judgment was correct as it stood, and there was no reason for reversing it. If the provision substituting a different punishment had been constitutionally valid, there was still no reason for reversing the judgment, for the governor and sheriff could have executed the writ of the legislature, and it was the design of the act that it should be executed by those officers in the case of a conviction and sentence which remained unexecuted when the act of 1860 passed, without any further resort to the courts. The judgment of reversal, even independently of the reasons

given, necessarily affirmed that she could not be punished under either of these legal provisions, and as there were no other modes of punishment, it followed that she could not be punished in any way.   The formal order for new trial, if it meant a new trial for the murder, upon the issue which had been once tried and determined, would have been plainly inconsistent with judgment of reversal, as well as with the reasons upon which it proceeded.   If it had been understood as a mandate to the oyer and terminer to proceed with the case in accordance with the principles established by the judgment of reversal, the discharge of the prisoner might have been ordered by that court without a further trial, the facts involved being contained in the record.   Enough appears in the case, as now presented, to show that the award of a new trial was improvidently entered, and the whole case being legitimately before us, on this writ of error, we are bound to give effect to the law as it has been pronounced, and we accordingly reverse the judgment of the Supreme Court, and affirm that of the oyer and terminer, and direct the prisoner to be discharged.

EMOTT, J. delivered an opinion, in which he examined at length the question whether it was necessary that a judgment should have passed to support a plea of *autre fois convict*—which was discussed in the Shepherd case.   The learned judge had not seen the opinion in that case, but arrived at the same conclusion as Mr. Justice SUTHERLAND had done.   He also concurred in the opinion of Judge SUTHERLAND, that such a reversal as that in this case does not impair the right to plead the former conviction in bar.   "The reversal in this court of the former judgment in this case is strongly analogous to the result of praying benefit of clergy in England in its consequences.   This fact remains, notwithstanding that this prisoner has been tried, convicted and sentenced without error in the process, indictment, pleadings or

trial. As this appears from the record itself, I have no hesitation in saying that the replications were no answer to the pleas."

Judge EMOTT declined to consider the effect of the repeal of the statute of 1860, and the passage of that of 1861, as necessary to his determination that the judgment should be affirmed.

All the Judges concurring with DENIO, Ch. J.

Judgment affirmed.